(159 App. Div. 1.)

LAFAYETTE STREET CHURCH SOCIETY OF BUFFALO v. NORTON.

(Supreme Court, Appellate Division, Third Department.    November 12, 1913.)

1. FRAUD (§ 58*)—ACTIONS—EVIDENCE—SUFFICIENCY.

Where plaintiff, a religious society, claimed that defendant, who purchased plaintiff's old church building, did so fraudulently and was liable for a profit made on the transaction, evidence *held* insufficient to show any fraud.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 55–59; Dec. Dig. § 58.*]

2. FRAUD (§ 26*)—BENEFIT DERIVED.

Where a church society sold defendant its old building so that he might lease it to a theater company and thus avoid the objections of some members of the congregation, the demand of the theater men that defendant give an option to purchase is not an advantage to him, the concealment of which would render him guilty of fraud upon the church; demand for an option being made before the transaction was consummated.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 6; Dec. Dig. § 26.*]

Appeal from Trial Term, Erie County.

Action by the Lafayette Street Church Society of Buffalo against Herbert F. J. Norton.    From a judgment for plaintiff, defendant appeals.    Reversed.

See, also, 156 App. Div. 924, 141 N. Y. Supp. 1127.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Shire & Jellinek, of Buffalo (Moses Shire and Vernon Cole, both of Buffalo, of counsel), for appellant.

Clinton & Clinton, of Buffalo (George Clinton, of Buffalo, of counsel), for respondent.

HOWARD, J.    When this case was in the Court of Appeals on review from the first trial, Chief Judge Cullen in his opinion summarized the facts as follows:

"The plaintiff is a religious corporation, and the defendant is a practicing lawyer, the brother and law partner of Nathaniel W. Norton, who was one of the trustees of the church and had been for a long time prior to the transaction in question.    In January, 1901, the plaintiff owned two church structures, one known as 'The Old Church Property,' which was no longer used for religious worship, and the other with a new and valuable edifice thereon, which was in constant use for church purposes.    The society was heavily in debt and the expense of holding 'The Old Church Property' was so great that 'it was imperatively necessary' to lease or sell it 'in order to secure present revenue.'    It was subject to a mortgage for $60,000, and while the carrying charges for interest and taxes amounted to a large sum annually, the income was but nominal.    For a long time efforts had been made to sell it without success, and it was impossible to lease it at a satisfactory rental, except for use as a theater, and some of the members of the congregation were unwilling that it should be leased for that purpose.    At the annual meeting held on the 8th of January, 1901, a resolution was passed authorizing the trustees to sell, lease, or otherwise dispose of it, and to execute the necessary instruments to carry the resolution into effect.    Thereafter at a meeting of the board of trustees the defendant's brother, one of their number, stated that after various negotiations, 'in view of the difficulty of making a lease direct because of the opposition of the people in the church to its

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

leasing, an arrangement was proposed by which the property should be transferred at a price stated to some person who should take the property subject to the present Erie County Bank mortgage and himself give back a mortgage upon the property for the balance of the purchase price as agreed upon. If such price could be agreed upon with such person, then that person to whom the property was transferred would be at liberty to enter into a lease with the party.' Thereupon a resolution was adopted directing application to be made to the court for authority to sell the property for a sum not less than $120,000, of which $60,000 was to be represented by the old mortgage and the balance by a new mortgage upon such terms and conditions as should be agreed upon. The application was accordingly made, and leave was granted by the court authorizing the sale on the terms specified. Thereafter a deed of the property was made to the defendant for the sum of $120,000 and a mortgage executed by him to the plaintiff for the sum of $60,000, but without any bond or personal obligation for the payment of said sum, and a lease was made by the defendant to the theater people for the term of five years. Just before the expiration of the demised term, in April, 1906, the defendant wrote to the plaintiff offering to pay $20,000 on his mortgage then past due and asking for an extension of time for the payment of the balance. The request was granted, and the defendant paid to the plaintiff the sum of $20,000 on account of the mortgage. Thereupon the defendant sold and conveyed the premises for the sum of $172,000."

At the second trial the learned trial justice in his opinion said:

"Upon the new trial the testimony is the same as that offered on the former trial, with one minor addition."

The first judgment was based upon the proposition that there was no fraud in the original transaction, but that, on the contrary, the parties fully understood each other, and that the defendant took the title, and knew that he was taking the title, as trustee for the plaintiff. Now, on the same evidence, the judgment is based on the proposition that the plaintiff did not understand the transaction, but that the defendant obtained title absolutely to the property, as the papers on their face indicate, but by fraud.

The trust theory having been destroyed by the Court of Appeals, the plaintiff can now recover, if it recovers at all, only upon the theory of fraud. Therefore the great mass of findings which pertains to the establishment of a trust are irrelevant for our consideration. Whatever we may think of the trust theory, as the first record stood, is of no moment now; that has been disposed of. We are to determine the question of fraud. In fact, that is the only question pressed upon us for consideration, although the plaintiff, in spite of the decision of the Court of Appeals, clings tenaciously to its notion that there was a trust created by the acts and intent of the parties. Of course there could not have been a trust created by the deliberate understanding of the parties and, at the same time, a title absolute obtained by fraud; the two ideas are antagonistic.

[1] The fraud on which this present judgment is based is the alleged concealment of the option. That is to say, the defendant is accused of concealing from the plaintiff the fact that the theater people might possibly wish to purchase the property before the expiration of their five-year lease and that he was to give them an option to that effect in the lease; that is, a right to purchase at any time during the five years for $172,000. The trial court has made two findings which

embody this charge of fraud.  He first finds that the defendant, at and before the time he took the deed from the plaintiff, knew the theater people would require an option to purchase at $172,000, and then he finds that the defendant concealed this fact from the trustees of the plaintiff.

We believe these findings are wholly without support in the evidence.  From the mouths of the plaintiff's own witnesses these findings are disproven.  Rife, the plaintiff's witness, was one of the theater men.  Speaking of the time when he first came to look at the Old Church Property, he testified both on direct and cross-examination:

"We had no idea of purchasing any property.  It was simply represented to us that we could lease it.  *  *  * "

This agent of the theater people who was negotiating to lease the property had never thought of purchasing it, so he says, had never wished for an option to purchase, until the "end of January, 1901." It was only when he learned from Mr. Caulkins, the architect, of the excessive cost of reconstructing the building, that the idea of purchasing came to him.  Kernan, another of the theater men, sworn for the plaintiff on the first trial, speaking of the lease itself and the option which it contained, even after he had obtained it, said:

"I never paid much attention to it, because I never expected to buy the property at that time."

Without quoting Knapp, the attorney for the theater people, it is sufficient to say that he entirely corroborates the other two witnesses as to the fact that no option was thought of by anybody until about January 28, 1901, and after the defendant had obtained the deed from the plaintiff.  The defendant's witnesses all swear positively that no option was ever talked of or thought of until about the day of executing the lease.  This positive evidence coming from all sources is opposed by nothing but circumstances and surmise.

The learned trial justice in his opinion says:

"The sole question, therefore, seems to be whether the defendant had any knowledge on the 26th day of January, 1901, at the time he received the deed from the plaintiff,  *  *  *  that the proposed lessee would be likely to insist upon an option to purchase the property at $172,000."

We agree that this is the only question to determine, for no other fraud is alleged, but we believe that the proof is overwhelming that the defendant had no such knowledge, and that the question should be resolved in his favor.

[2]  But if we were to reach an opposite conclusion, and assuming all that the plaintiff claims, the defendant concealed nothing from the plaintiff of value to the plaintiff, concealed nothing except the fact that he had a possible market for the property, not a certain market, only a possible and doubtful market, a market which excluded his right to sell in any other market.  Whether the theater people would in fact buy, whether the venture would be a success so that they would wish to buy, were elements to continue in doubt for five years.  What effect upon the transactions between the plaintiff and the defendant would knowledge of this option have had?  Would it have caused

the trustees to refuse to deed to the defendant? Is it certain that a mere right, on the part of the theater people, to buy the property at any time within five years, would have been considered an advantage to the lessor? Might it not have been considered a detriment? Ought it not to have been considered a detriment? The option was a concession which the theater people demanded from the defendant. They would have been as likely to purchase without the option as with it; perhaps they would have been more eager. They gave no assurance that they would purchase, they gave no hint; they tied the defendant hand and foot without giving him anything in return. Instead of the option being considered an advantage to the defendant, he evidently considered it the reverse—both parties so considered it—for the defendant did not embody it in his first draft of the lease and it was only put in after argument and insistence on the part of Knapp, the attorney for the theater people. I think it should be held as a matter of law that an option to purchase granted by a lessor to a lessee is not an advantage to the owner of the property.

The judgment should be reversed, with costs.

The findings of which we disapprove are those numbered 5, 9, 10, 11, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 26, 27, 28, 32, 36, 37, 38, 39, 40, 42, 43, 44, 45, 46, 47, 57, 58, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71.

Judgment reversed on law and facts, with costs, and complaint dismissed, with costs. All concur except WOODWARD, J., not voting.